# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 19-2355

———————————————

Jeanie Lawrence

*Plaintiff - Appellant*

v.

Andrew Saul, Commissioner, Social Security Administration

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the Eastern District of Arkansas - Jonesboro

——————————

Submitted: January 16, 2020
Filed: July 31, 2020

——————————

Before KELLY, MELLOY, and KOBES, Circuit Judges.

——————————

MELLOY, Circuit Judge.

Jeanie Lawrence appeals the district court's[1] dismissal of her challenge to the Social Security Administration's ("Commissioner") denial of her application for

———————————————

[1]The Honorable James M. Moody, Jr., United States District Judge for the Eastern District of Arkansas, adopting the Recommended Disposition of Patricia S. Harris, United States Magistrate Judge for the Eastern District of Arkansas.

disability insurance benefits and supplemental security income. Because substantial evidence supports the Commissioner's decision, we affirm.

I.

In April 2016, at the age of 30, Lawrence applied for benefits alleging a disability onset date of March 23, 2016. She presented a complicated medical history concerning her right arm and shoulder, also alleging shoulder pain, chest pain, migraine headaches, and right foot tendonitis. After denial of her application, she received a March 20, 2017 hearing with an administrative law judge ("ALJ"). At the hearing, and through medical evidence submitted post-hearing, Lawrence fleshed out her arguments more completely and described a difficult-to-diagnosis suite of neck, shoulder, arm, wrist, and hand issues. Specifically, her medical records showed improvement in her shoulder, but she alleged nerve impingement in her neck and elbow were causing ongoing pain that radiated to her hands and wrists.

The ALJ determined: Lawrence met the requirements for insured status through June 30, 2019; she had not engaged in substantial gainful activity since her alleged onset date; she suffered the severe medically determinable impairment of bicep tendinitis status post arthroscopy; and her impairment did not meet or medically equal the severity of a listed impairment. The ALJ then determined Lawrence retained the Residual Functional Capacity ("RFC") to perform sedentary work with the limitations that she "cannot perform right upper extremity overhead" reaching responsibilities and she "cannot perform more than frequent right upper extremity handling duties."[2]

---

[2]As we noted in Owens v. Colvin, 727 F.3d 850, 851–52 (8th Cir. 2013):

The Dictionary of Occupational Titles, a resource for determining the duties of a claimant's past relevant work, defines "frequently" as "activity or condition [that] exists from 1/3 to 2/3 of the time," and "occasionally" as "activity or condition [that] exists up to 1/3 of the

Based on this RFC determination and testimony from a vocational expert, the ALJ determined there existed at least two jobs in significant numbers that Lawrence could perform such that she was not disabled. See 20 C.F.R. §§ 404.1520(a) and 416 920(a) (setting forth the five-step sequential analysis).

As detailed below, the ALJ reached these conclusions after reviewing Lawrence's subjective complaints and descriptions of her abilities, her medical treatment records, opinion testimony from a consulting physician, and testimony from a vocational expert. The ALJ found the medically determinable impairments reasonably could be expected to cause Lawrence's alleged symptoms but did not fully support the intensity and persistence of Lawrence's subjective complaints. The ALJ repeatedly acknowledged that Lawrence experienced, and would experience, some pain and discomfort, but not at a disabling level. On appeal, Lawrence challenges only the determination that she was capable of frequent right upper extremity handling. As such, we focus our discussion on evidence concerning pain and limitations related to this limitation.[3]

Lawrence's treatment records indicate investigations and a diagnosis of symptoms suggestive of peripheral neuropathy between January 2015 and February 2017. In January 2015, she sought medical care and reported that she had been experiencing pain and swelling in both hands for two years and pain in her right foot for one month. Also in January 2015 she complained of tingling in her hands, and her examination revealed positive Tinel's sign (an indicator of irritated nerves possibly

_____

time." (citation omitted).

[3]Although our detailed discussion is targeted, we have considered her arguments and the record as a whole as to all of her alleged impairments and their cumulative effect upon her limitations. See Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) ("When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments.").

indicative of carpal or cubital tunnel syndrome). April 2015 nerve conduction studies of bilateral upper extremities did not show entrapment neuropathy, and her median and ulnar nerves showed normal motor and sensory function. Neuropathy investigations throughout this time were not isolated to her upper extremities, rather, they focused systemically on neuropathy symptoms, including symptoms in her feet. Ultimately, Lawrence appears to have intermittently filled prescriptions for gabapentin to treat neuropathy, but there are no nerve conduction studies or EMGs confirming neuropathy. She also received pain killers, anti-inflammatories, and corticosteroids, but she reported that they did not provide relief.

In March 2016, she received treatment for chest pain and right shoulder pain. She was initially diagnosed with costochondritis (chest wall pain), but soon after, she was diagnosed with, and treated for, an acute respiratory infection.

Treatment records from April 2016 through August 2017 addressed right shoulder and elbow pain as well as neck pain. Early in this time period, she exhibited shoulder pain on motion and received anti-inflammatories, muscle relaxants and Tylenol with codeine. An April 2016 x-ray showed no cause for her shoulder pain. In May 2016, she complained of sharp pain and tingling in her right scalpula and right arm with tingling in her hand. She was diagnosed with right shoulder fistula and radiculopathy of the cervical region. Her doctor noted muscle relaxers had been helpful to Lawrence in the past, continued her prescription, and ordered occupational therapy. She underwent occupational therapy in the following weeks, but did not substantially improve in pain or range of motion. She participated in physical therapy several times between June and December 2016.

A May 2016 MRI of her cervical spine showed some bone spur formation but without narrowing of the spinal canal or nerve passages ("left paracentral disc osteophyte complex . . . no definite spinal canal or neural foramina stenosis"). A May 2016 MRI of her right shoulder showed: "Mild partial tearing, bursal side of

supraspinatus tendon; Minimal degenerative changes of acromioclavicular joint; and Minimal fluid within subacromial/subdeltoid bursa could represent minimal bursitis."

In July 2016, Lawrence saw orthopedic surgeon Dr. Throckmorton. Dr. Throckmorton described Lawrence's shoulder MRI as showing an intact rotator cuff with minimal tendinopathy. He also described a "little bit" of bicep tendinopathy. He noted a "markedly positive Spurling's test to the right," elevation of her right arm limited to 100 degrees, and bicep tenderness.[4] He also noted that she had "intact medial, radio and axillary motor and sensory function." Finally, he noted that she reported her pain as moderate to severe.

Dr. Throckmorton summarized his findings, stating that Lawrence appeared to be having pain likely caused by more than one ailment—"bicep tendinitis with anterior shoulder pain that is worse with motion" and "cervical radicular pain with more neuropathic pain presentation around her shoulder blades and down into her hand." Dr. Throckmorton ordered a bicep sheath injection which he later reported as providing "great relief." Relief was not long-lasting, and ultimately, after pursuing prescribed therapy and conservative treatment, Dr. Throckmorton performed right shoulder arthroscopy with bicep tenodesis in August 2016.

Meanwhile, Dr. Throckmorton referred Lawrence to physician's assistant Pooja Peters for further evaluation and treatment of her neck and radicular pain. Like Dr. Throckmorton, Peters opined that Lawrence's pain could be coming from multiple issues. As Lawrence describes in her briefing, Peters indicated "that much of Lawrence's shoulder and periscapular pain was actually coming from the shoulder and the biceps tendinitis, while a component could be coming from the neck even

---

[4]A Spurling's test is a clinical cervical compression test that involves manipulation of a patient's head and neck to check for possible cervical-nerve-related radiating pain.

though there was no severe cord or nerve root impingement." Peters indicated the cervical MRI did not appear to show a cause for her right side pain. Peters also observed positive Tinel's sign in both elbows and wrists "consistent with carpal tunnel syndrome and cubital tunnel syndrome." Peters ordered an epidural steroid injection, prescribed gabapentin to be used at bedtime for nerve pain, and naproxen for inflammatory pain.

In late August 2016, into September and throughout the fall, Lawrence continued to see medical providers with complaints of neck, shoulder and upper extremity pain. In appointments shortly after her surgery, many of her complaints or observed limitations were described as ongoing effects of surgical wounds. For example, she saw Dr. Rivera-Tavarez on August 31. He noted soreness from surgery. He also opined as to the overall source of her complaints of multiple-source pain, and like Peters and Dr. Throckmorton, described his impression of her cervical MRI:

> I do not think any more interventional procedures will be of benefit. I do not think she has a cervical condition that is causing this. I think this is more secondary to poor posture and cervical scapulothoracic muscle imbalances, more like a dynamic thoracic outlet syndrome. The nerve test was normal. I think even the hand symptoms are related to compression of the brachial plexus, but secondary to the myofascial components. That needs to be addressed in rehab also. In the neck MRI, she does have some very tiny disc osteophyte complexes, but actually those are even more on the left side and on the upper cervical spine. That would not explain any symptoms on her hands. Again, I think that is just an incidental finding.

In December 2016 Lawrence saw a physician's assistant and reported her shoulder pain was improving, but the left side of her neck was painful. Then, in late January 2017, she reported experiencing a pop in her right elbow that had increased her pain. She stated, however, that she experienced no swelling and had not had difficulty moving her elbow. In fact, examination revealed that she had good 5 out

-6-

of 5 strength throughout her triceps with resisted elbow extension. She was instructed to continue therapy. Soon after, she again saw Drs. Throckmorton and Rivera-Tavarez. Dr. Riverez-Tavarez noted tenderness and soreness in her upper trapezius on both sides, limited shoulder range of motion, but 5 out of 5 strength in her upper extremity myotomes. He indicated that he did not believe her pain was "purely an orthopedic problem" and did not believe further injections or surgical interventions would be appropriate. Rather, he opined that she appeared to have a "generalized systemic inflammatory component." He encouraged Lawrence to stop smoking and to exercise to address inflamation.

In a follow-up visit, Dr. Throckmorton indicated that Lawrence had nearly full range of motion in her shoulder (160 degrees). He stated: "She is doing very well regarding her shoulder. Frankly, she has no pain in that regard, but she does have full body pain in her neck and also the posterior aspect of her right elbow. . . . she is tender to palpation over her triceps tendon [and] has pain to resisted elbow extension." Dr. Throckmorton ordered therapy to switch from her shoulder to her tricep.

Lawrence continued to seek treatment leading up to her March 20, 2017 hearing with the ALJ. By the time of her hearing, a doctor had suggested a possible tricep tendon rupture and had ordered additional imaging. An x-ray showed no bone abnormalities to explain her pain, and a March 18 MRI showed her tricep was in "good condition." That same MRI, however, showed: "She has some mild tendinitis at her flexor pronator origin. She also has a subluxed ulnar nerve medially." The subluxed ulnar nerve was consistent with cubital tunnel syndrome. Finally, in an April 2017 examination with a physician's assistant, Lawrence exhibited "pain with all ranges of motion and all stress tests."

Prior to and after surgery, Lawrence had been on muscle relaxers, non-steroidal anti-inflammatories, and non-narcotic painkillers. She filled prescriptions for narcotic pain killers between June and August 2016 and again in February 2017.

Regarding other evidence, Lawrence stated in her spring 2016 application and accompanying materials that her daily activities included preparing her kids for school, making food for breakfast, cleaning the house, walking the dog, doing laundry, making supper, and helping kids with homework and bathing. She described needing help dressing, bathing, and brushing her hair, all generally related to an inability to lift her arm. She also indicated she could not cut meat and was trying to train herself to use her left hand. Notwithstanding her description of her daily activities, she also stated she could not sweep, mop, make beds, or wash dishes. In her testimony at the March 20, 2017 hearing with the ALJ, she described similar but increased limitations and emphasized the degree to which her husband assisted her in her tasks.

At the hearing, when presented with the hypothetical RFC described above with sedentary work but without "right upper extremity overhead" reaching responsibilities and with no "more than frequent right upper extremity handling duties," the vocational expert identified the jobs of addresser (Dictionary of Occupational Titles 209.587-010) and call out operator (id. 237.367-014).

Finally, in reaching an ultimate conclusion, the ALJ partially rejected opinion evidence from one treating physician and also from a non-examining physician with the State Disability Determination Service. In July 2016, prior to her surgery, Lawrence met with treating physician Dr. John Ball. At that time, Dr. Ball stated Lawrence could not return to work. The ALJ assigned "very little weight" to Dr. Ball's opinion, stating Dr. Ball provided "very little explanation of the evidence relied on in forming" his opinion, and also noting that Dr. Ball did not have an extended treatment history with Lawrence. The non-examining State Service

physician concluded Lawrence had no severe impairment. The ALJ rejected this conclusion as inconsistent with the balance of the medical evidence, finding instead that the evidence showed a severe impairment with an RFC as described above. In rejecting the non-treating physician's opinion, therefore, the ALJ favored Lawrence's view of the record by rejecting a medical opinion that was adverse to Lawrence's claim.

The Appeals Council denied further review, making the ALJ's decision, the final agency decision. The district court affirmed and dismissed Lawrence's complaint.

## II.

"We review de novo a district court decision affirming a denial of social security benefits and uphold the [Commissioner's] decision if substantial evidence supports [the] findings." Strongson v. Barnhart, 361 F.3d 1066, 1069 (8th Cir. 2004). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017) (quoting Brown v. Colvin, 825 F.3d 936, 939 (8th Cir. 2016)). Our review pursuant to the substantial evidence standard is not one sided. Rather, "[w]e consider the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." Id.

Ultimately, the RFC determination is a "medical question," that "must be supported by some medical evidence of [Lawrence's] ability to function in the workplace." Combs, 878 F.3d at 646 (quoting Steed v. Astrue, 524 F.3d 872, 875 (8th Cir. 2008)). "[A]lthough medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner," Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), "based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's

own description of [her] limitations," Combs, 878 F.3d at 646 (citation omitted) (alteration in original). Similarly, the underlying determination as to the severity of impairments is not based exclusively on medical evidence or subjective complaints. Rather, regulations set forth assorted categories of evidence that may help shed light on the intensity, persistence, and limiting effects of symptoms.[5] Similar factors guide the analysis of whether a claimant's subjective complaints are consistent with the medical evidence. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (listing factors such as: "the claimant's daily activities," "the duration, frequency and intensity of the pain," "precipitating and aggravating factors," "dosage, effectiveness and side effects of medication," and "functional restrictions").[6]

---

[5]In identical terms, 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) list "Factors relevant to . . . symptoms, such as pain, which [the Commissioner] will consider":

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

[6]In Polaski and cases that followed, we examined subjective complaints with reference to a claimant's credibility. Social Security Ruling 16-3p eliminates use of the term "credibility" and clarifies that the Commissioner's review of subjective assertions of the severity of symptoms is not an examination of a claimant's character, but rather, is an examination for the level of consistency between subjective assertions and the balance of the record as a whole. SSR 16-3p applies to Lawrence's

-10-

Here, Lawrence argues the ALJ misconstrued the record and, as a result, failed to adequately develop the record. In particular, Lawrence argues the ALJ relied too strongly on evidence predating her surgery, focused too narrowly on her shoulder, did not focus adequately on her subluxed ulnar nerve as causing her cubital and carpal tunnel syndrome, and overly discounted her subjective statements concerning limitations on daily activities. We disagree. On balance, the detailed and extensive evidence of medical treatment presents a mixed record. Lawrence sought treatment for ongoing pain that several care providers described as having multiple likely causes. She received some successful treatment, particularly as to her shoulder, but the focus of medical inquiries repeatedly shifted consistent with the difficult-to-diagnose combination of symptoms she reported. Notwithstanding Lawrence's complaints of pain and her positive Spurling's test, physicians repeatedly described the 2016 MRI as not illustrating nerve impingement in her neck. Dr. Throckmorton noted her substantial shoulder improvement at a time approximately five months after surgery. Dr. Rivera-Tavarez advised no aggressive treatment and recommended conservative steps to reduce inflammation. And Lawrence frequently exhibited good range of motion and full strength, even into 2017.

Lawrence, in contrast, places great weight on the March 2017 MRI showing the subluxed ulnar nerve and points to this imaging as supportive of a claim of disabling carpal and cubital tunnel syndrome. The ALJ, however, did not fail to acknowledge this MRI or other matters Lawrence focuses upon in her arguments. Rather, the ALJ placed different but permissible weight on these matters. See Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006) (describing the resolution of conflicting medical evidence as the role of the ALJ). In this regard, we note that at the time of her hearing, recent medical opinions had suggested possible tricep concerns, but the same MRI she relies upon showed no issues with her tricep.

---

case, but it largely changes terminology rather than the substantive analysis to be applied.

Further, Lawrence's testimony concerning her daily activities was vague and does not clearly call into question the ALJ's conclusions. To the extent her description of limitations on her daily activities suggests shoulder-related limitations, her descriptions are not entirely consistent with the generally successful treatment as described by Dr. Throckmorton. And, the ALJ's conclusions as to the severity of pain and limitations enjoy support in the fact that Lawrence was prescribed generally conservative treatment throughout her later medical records, including repeated suggestions that invasive treatment should not be considered but that therapy, occupational therapy, and general measures to address inflamation—such as increasing exercise and cutting down on smoking—should be pursued. See Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013) (noting that recommendations for increased exercise and an absence of physician-imposed restrictions may be inconsistent with claims of disability); Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009).

At the end of the day, we do not suggest Lawrence presents an unsympathetic case, nor do disagree with the ALJ's acknowledgment that she likely will experience ongoing pain. We conclude, however, that the ALJ's decision is supported by substantial evidence concerning the limits of Lawrence's ability to reach and handle throughout an otherwise sedentary workday. Although the present record certainly could have supported a different outcome, "[i]f substantial evidence supports the Commissioner's decision, we may not reverse even if we might have decided the case differently." Strongson, 361 F.3d at 1070.

Finally, as noted by the Commissioner at oral argument and as later acknowledged by Lawrence in a letter to our Court, one of the jobs cited by the vocational expert as available in the national economy—call out operator—requires only occasional, rather than frequent, handling. The identified job, therefore, is even less demanding on Lawrence's upper extremities than would be permitted by the

Commissioner's RFC limitation. This fact lends additional support to our conclusion that substantial evidence supports the Commissioner's decision.

We affirm the judgment of the district court denying the petition for review.

_____